# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NORTH DAKOTA

In Re:                                                    Bankruptcy No. 13-30191
                                                          Chapter 7
Charles C. Mikkelson,

                    Debtor.
_____/

# MEMORANDUM AND ORDER

## I.    INTRODUCTION

Kathleen A. Lureen commenced an involuntary Chapter 7 bankruptcy case against Charles C. Mikkelson on March 29, 2013.  Lureen alleges that Mikkelson failed to make any payments toward the judgment entered against him and in favor of Lureen, that he transferred assets to avoid attachment of the judgment lien to those assets and that the Bankruptcy Code offers relief that is unavailable under state law.

Mikkelson filed an answer controverting the involuntary bankruptcy petition on April 12, 2013.  He argues that granting an order for relief is inappropriate because the involuntary bankruptcy petition is a continuation of a two-party debt collection dispute that state law already addressed.  Mikkelson further alleges that he is generally paying his debts as they become due, that he has very few creditors and that his creditors will derive no benefit from the entry of an order for relief because there are no nonexempt assets available to liquidate for the benefit of creditors.  He also requests that the Court abstain from exercising jurisdiction under 11 U.S.C. § 305 because this case is a two-party, debt collection dispute.

1

The Court held a trial on the order for relief. For the reasons provided below, the Court finds in favor of Lureen and enters an order for relief against Mikkelson.

## II.   FINDINGS OF FACT

### A.   Lureen's Claim

In September 2010, putative debtor Charles C. Mikkelson, who is 73 years old, intentionally collided his pickup truck into a vehicle driven by Kathleen A. Lureen, who is now 65 years old. Before the collision, Mikkelson and Lureen dated and lived together for thirteen or fourteen years. Mikkelson testified he was under an immense amount of stress and acted irrationally when the accident occurred.

Mikkelson was charged with a criminal offense as a result of this conduct and pled guilty to attempted murder. The district court sentenced Mikkelson to 24 months in prison (five years with three years suspended) and ordered him to pay restitution of approximately $3,500 and court fees. Exh. 202. Mikkelson testified that he was sentenced in April 2011 and his incarceration began on May 9, 2011. He was released from prison on December 15, 2012. He paid the restitution and fees in full in March 2013, reportedly before they were due.

On September 7, 2011, Lureen filed a civil action against Mikkelson in North Dakota District Court, seeking to recover damages for injuries she sustained during and following the collision. Exh. 202. The lawsuit was filed and tried while Mikkelson was in prison. In a memorandum opinion dated October 22, 2012, the district court found in favor of Lureen. Id. It entered judgment against Mikkelson in the sum of $5,288,093.44 on December 3, 2012. Exh. 201.

2

At the involuntary bankruptcy trial, Mikkelson acknowledged he has made no voluntary payments toward the judgment.  He did not direct his brother, who handled his financial affairs while he was incarcerated,[1] to make any payments to Lureen and he was not aware of any payments made to her, other than insurance proceeds.[2]

Mikkelson explained that paying the entire $5,000,000 judgment was out of the question and no one on behalf of Lureen attempted to establish a payment plan with him.  He also suggested that a settlement was a better resolution of the debt because he believed that, if he made any payments to Lureen, legal fees would consume a large portion of any payment and she would receive no benefit.  Mikkelson testified that before Lureen filed the civil suit he attempted to settle the dispute with her by making various offers, including paying $200 or $400 per month or making lump sum payments of either $50,000 or $100,000.  He believed a civil suit could follow his criminal conviction, and he wanted closure and a complete release of any claims. Consequently, negotiations for resolution of a civil claim began while the attorney who defended him against the criminal charges represented him.   Mikkelson explained he would have sold assets and liquidated accounts to make payments to her.  Lureen did not accept any of Mikkelson's offers.

---

[1] Mikkelson asked his brother, Dwight Mikkelson, to assume responsibility for Mikkelson's financial affairs while Mikkelson was incarcerated.  To facilitate the financial transactions, Mikkelson granted Dwight Mikkelson power of attorney to act on his behalf.

[2] Mikkelson testified that Lureen received $100,000 in insurance proceeds.  It was not clear whether these proceeds were disbursed by Mikkelson's or Lureen's insurance carrier.

3

On March 29, 2013, Lureen commenced an involuntary Chapter 7 bankruptcy case against Mikkelson.  Lureen is the sole petitioning creditor. In the involuntary bankruptcy petition, she lists the $5,288,093.44 judgment as the basis for her claim. Mikkelson acknowledged that Lureen is one of his creditors, and he does not dispute the $5,288,093.44 sum owed to her.

**B.    Mikkelson's Financial Status**

After he was released from incarceration in December 2012, Mikkelson resumed control of his financial affairs.  Based upon the evidence received at trial, from the time Mikkelson was released until the date Lureen filed the involuntary petition, Mikkelson's assets included:

Investments/Insurance Policies as of January 2013
    Midland National Life Insurance Company Annuity - $9,533.94 (Exh. 210 -
        accumulation value plus interest adjustment)
    E-trade IRA - $27,536.86 (Exh. 211)
    E-trade Roth IRA - $84,000 (Exh. 205)
    Foresters Life Insurance Policy - $5,000.00 (Exh. 207)
    Thrivent Life Insurance Policy - $16,000.00 (Mikkelson testified this was the cash
        value of the life insurance policy; the original face value was $10,000)
    Thrivent IRA - $95,000 (Exh. 205)
    Alerus 401K - $70,000 (Exh. 205)

Chattel Property as of March 15, 2013
    2 Motorcycles - $200 (Exh. 205)
    2 Snowmobiles - $200 (Exh. 205)
    1 Boat - $200 (Exh. 205)
    2001 Pickup - $6,000 (Exh. 205)
    IHC Truck 1976 - $1,000 (Exh. 205)
    Misc. Tools - $1,000 (Exh. 205)

Real Property
    Homestead - $85,000 (Transferred March 25, 2011 and reacquired
                                March 29, 2013)
Other Assets
    Prepaid attorney's fees - not less than $1,000
    Prepaid fuel - $2,800

4

Income
    Investment income
        Thrivent IRA - $840/month[3] (Exh. 205; Testimony)
        Alerus 401K - $295/month (Exh. 205)
    Social security - $1,000/month (Exh. 205)
    Military retirement - $655/month (Exh. 205)

Since his release from incarceration, Mikkelson has been unemployed. He was seeking employment at the time of trial. Prior to his incarceration, Mikkelson was a member of the armed forces for over 30 years and held a variety of jobs. As noted above, he currently collects income from military retirement as well as social security and investment income. Exh. 205.

Mikkelson's liabilities included the following debts: $1,900 on a Small Business Administration loan; a $1,200 hospital bill and a $1,200 ambulance bill;[4] two JPMorgan Chase credit card bills, one with an unknown balance and one with a balance of $200 or $300; and a loan on a 2001 pickup truck, which is approximately $3,000. See Exh. 205. Mikkelson also testified that he paid taxes and he retained an attorney to represent him in the civil case and this bankruptcy matter. Based on the evidence received at trial, Mikkelson's liabilities total $7,600 plus taxes, attorney fees, living expenses (including water, electricity, heat, gas, medical co-pays, prescriptions) and his debt to Lureen.[5] Mikkelson stated that he likes to stay current on his bills and pay them

---

[3] Although Exhibit 205 lists this amount as $880.00, Mikkelson testified during trial the correct figure is $840.00 per month.

[4] Mikkelson testified he submitted the hospital bill and the ambulance bill to TriCare, an insurance agency that may cover the expenses, prior to trial. Mikkelson was unsure of their status at the time of trial.

[5] Mikkelson estimated he spends at least $100 or more on water and heat and approximately $300 on gas for his pickup truck per month.

as they become due.  He was frustrated when one of his creditors refused to accept a recent payment. Specifically, Mikkelson attempted to make a payment on one of his Chase credit card accounts after the involuntary petition was filed, but Chase returned the payment to him.  Mikkelson believed this occurred because Lureen filed the involuntary bankruptcy petition.

### 1.    Liquidation of Assets

Mikkelson testified that while he was incarcerated, his bills accumulated and he owed past-due state and federal taxes and penalties.  As a result, he withdrew funds from two of his IRA accounts and from one of his life insurance policies shortly after he was released.  On March 1, 2013, he liquidated his E-Trade IRA account with a balance of $27,536.63, reportedly to pay bills including approximately $8,000 in taxes.  See Exh. 211.  In April 2013, Mikkelson liquidated his Midland National Life Insurance Company annuity account with a balance of over $9,533.94.  Exh. 210.  After deducting the surrender charge and taxes, Mikkelson received $7,438.45 from his Midland account, which he testified he used to pay taxes.  See Exhs. 209, 210.  In or about May 2013, Mikkelson took a $10,000 loan on his Thrivent life insurance policy, reportedly to pay bills.  See Exh. 207.  Mikkelson represented that he still retains $6,000 in equity in his policy.  Id.

Mikkelson deposited a portion of the money he withdrew from these accounts into his checking account at First Community Credit Union.  See Exh. 209.  Although Mikkelson testified he used the funds for bills and taxes, when asked about specific withdrawals of the deposited funds from his checking account, he could not recall how

6

he spent the majority of the funds with two exceptions–prepaid fuel and attorney fees.[6]

Mikkelson specifically remembered withdrawing $4,805 from his First Community Credit Union checking account on March 7, 2013, to prepay Farmers Union for propane and fuel.  He explained he previously had prepaid propane but had not prepaid fuel. Mikkelson testified that he prepaid for fuel on this occasion because his objective was to "spend money."[7]  He stated he spent about $1,500 to prepay propane and $3,300 to prepay fuel.  At the time of trial, a credit of approximately $2,800 remained in the Farmers Union account.

The second withdrawal Mikkelson recalled took place on March 8, 2013. Mikkelson withdrew $5,000 from his checking account to pay Don Krassin, the attorney who represented him in the civil suit filed by Lureen.  Mikkelson explained he owed Krassin approximately $4,000 from previous work and prepaid him $1,000.  He indicated he often prepaid attorney's fees each month.

---

[6] Mikkelson could not recall the application of the following funds:

| DATE | ACTIVITY | AMOUNT |
|---|---|---|
| March 4, 2013 | EFT JPMORGAN CHASE EPAY | $1,550.50 |
| March 5, 2013 | Withdrawal | $3,005.00 |
| March 6, 2013 | Withdrawal | $1,565.00 |
| March 7, 2013 | Withdrawal - Cash | $500.00 |
| March 8, 2013 | Withdrawal - Cash | $400.00 |
| TOTAL | | $7,020.50 |

See Exh. 209.

[7] After Mikkelson indicated his objective was to "spend money," Lureen's attorney inquired whether he spent money to avoid paying Lureen.  Mikkelson did not directly respond to Lureen's attorney's inquiry; rather, he responded that no one established the amount Lureen required him to pay.

7

As to the numerous other withdrawals from his First Community Credit Union bank account, Mikkelson offered a general explanation that he used the funds to pay for water, electricity, heat, gas, medical co-pays, prescriptions and attorney's fees.  He also testified, however, that he generally used his credit cards to pay bills.

Bank records from First Community Credit Union received as evidence show Mikkelson made a $3,000 loan payment on April 22, 2013.  The transaction is titled "Personal-Travis."  Exh. 209.

Mikkelson, or his brother, Dwight, also withdrew money from an account at Gate City Bank during this time period.  These withdrawals included:

| DATE | ACTIVITY | AMOUNT |
|------|----------|--------|
| December 6, 2012 | Withdrawal | $1,000.00 |
| January 7, 2013 | Withdrawal - Check | $9,000.00[8] |
| March 1, 2013 | Withdrawal - Cash | $1,000.00 |
| March 22, 2013 | Withdrawal - Cash | $1,000.00 |
| March 27, 2013 | Withdrawal - Cash | $800.00 |
| April 22, 2013 | Withdrawal - Cash | $1,000.00 |
| May 20, 2013 | Withdrawal - Cash | $1,000.00 |
| TOTAL | | $14,800.00 |

Exh. 208.  Mikkelson did not have an accounting for how these funds were spent, but he claimed that he lost approximately $1,000.00 gambling.  He testified that he spends his money "any way he feels like it."

### 2.    Property Transfers

#### a.    Real Estate

On March 25, 2011, 45 days before he was incarcerated, Mikkelson transferred the following real property in Richland County, North Dakota, to his sons Travis C.

---

[8] Mikkelson withdrew this amount by issuing a check to the Internal Revenue Service for $9,000.00.  Exh. 208.

Mikkelson and Trevor C. Mikkelson via quit claim deed:

> That part of the Northeast Quarter of the Northeast Quarter (NE 1/4, NE 1/4) of Section Thirty One (31) in Township One Hundred Thirty Two (132) North, of Range Forty-Seven (47), West of the Fifth Principal Meridian, Richard County, North Dakota, described as follows: Beginning at a point 499.7 feet West of the Northeast corner of the said Northeast Quarter (NE 1/4) of Section Thirty-one (31); thence West 330 feet; then South 522 feet; thence East 330 feet; thence north 522 feet, to the point of beginning.

Exh. 203 (Wahpeton Property). With the quit claim deed, Mikkelson reserved a life estate for himself and granted remainder interests to Travis C. Mikkelson and Trevor C. Mikkelson. Id. Mikkelson testified he thought the quit claim deed transferred his entire interest in the Wahpeton Property to his sons. He explained that he transferred the Wahpeton Property to his sons so they had the ability to control the property if anything happened to him during his incarceration. Mikkelson's sons provided no remuneration for remainder interests in the Wahpeton Property, and Mikkelson did not owe his sons any money on the date of the transfer. At the time of the transfer, Mikkelson anticipated that he would owe Lureen money.

Mikkelson testified that the Wahpeton Property is his home and that he is aware North Dakota law provides a $100,000 homestead exemption. According to Mikkelson, the estimated current market value of the Wahpeton Property is $85,000. There are no consensual liens against the property.

On March 29, 2013, Travis C. Mikkelson and Trevor C. Mikkelson transferred their remainder interests in the Wahpeton Property back to Mikkelson via quit claim deed. Exh. 204. Mikkelson testified that the remainder interests were deeded to him because Lureen threatened legal action as a result of the initial transfer. See Exh. 212. He believed that if his sons returned their interests in the Wahpeton Property to him,

9

then the transfer would not be considered "fraudulent," and Lureen would not pursue

legal action.  Mikkelson considered the possibility of facilitating a transfer of the

remainder interest to Lureen, but declined to make these arrangements because it was

not clear whether Lureen would forego further legal action after the transfer.

b.    Bobcat Skid Steer Loader

On the day of his incarceration, Mikkelson sold a Model 863 2000 Bobcat skid

steer loader with scoop and all attachments to Travis Mikkelson.[9]  Exh. 206.  Travis

Mikkelson paid $5,000 for the Bobcat, which Mikkelson testified he received in cash

and spent on bills and attorney's fees.  The bill of sale indicated the price was "to be

paid by Travis Mikkelson providing upkeep and safeguarding of the homestead of seller

Charles Mikkelson during the next 24 months."  Exh. 206.

In December 2012, the same month as Mikkelson was released from prison,

Travis Mikkelson traded the 2000 Bobcat loader for a newer model.  Exh. 206.

Mikkelson testified the cash price for the new loader and the trade-in allowance for the

2000 loader listed on the retail order form appeared to be $29,600 and approximately

$11,000, respectively, but because the writing on the form is blurred and difficult to

decipher, he could not be certain.  He also testified that the difference between the

cash price and trade-in allowance appeared to be $18,630, but he would need to verify

the amount with Travis Mikkelson.  He explained, however, that the difference appeared

to be correct from what he knew of the two pieces of equipment.  Mikkelson explained

---

[9] During his deposition, Mikkelson testified that he sold the Bobcat to Travis
Mikkelson so Travis Mikkelson could care for the Wahpeton Property.  During trial,
Mikkelson testified he sold the Bobcat to Travis Mikkelson so he had the ability to
control its use.

10

that Travis Mikkelson works for Bobcat, which presumably lowered the cash price to less than what a regular consumer would pay.  As a stipulation of the sale, Travis Mikkelson promised not to use the new Bobcat for commercial purposes.

 After Travis Mikkelson procured the new loader, he transported it to the Wahpeton Property where Mikkelson lives, and it has remained there since.  Travis Mikkelson has only used the loader to maintain the Wahpeton Property.  In the winter months, he used it to move snow at the Wahpeton Property.  Travis Mikkelson currently makes the payments on the new Bobcat loader.

### C.    Discovery

Mikkelson failed to disclose his E-Trade IRA account, his Midland annuity account, the liquidation of these accounts and the loan against his Thrivent life insurance policy in response to interrogatories served by Lureen two weeks before the involuntary bankruptcy petition was filed.[10]  See Exh. 205.  He did not disclose this information until his deposition on May 16, 2013.  He testified that this information was not included in his response to the interrogatories because it was "not relative to anything" that was occurring.  He explained he believed the accounts and policies were exempt under state law.  Despite this explanation, Mikkelson disclosed three other accounts and their current market value in his response to Lureen's interrogatories: (1) a Roth IRA Plan with E-Trade, $84,000; (2) an IRA plan with Thrivent, $95,000; and (3) a 401K with Alerus, $70,000.  Exh. 205.

---

[10] In his responses to interrogatories, Mikkelson stated that he owned life insurance policies, but did not specifically list the Thrivent life insurance policy or a $5,000 life insurance policy with Foresters.  Exh. 205, ¶ 10.  He provided this information in an undated handwritten document after his deposition.  Exh. 207.

11

In addition, Mikkelson did not disclose the $2,800 credit with Farmers Union for prepaid fuel as an asset in his responses to Lureen's interrogatories.  See Exh. 205. Likewise, Mikkelson failed to disclose the prepaid funds held in Attorney Krassin's trust account as an asset in his responses to Lureen's interrogatories.  See Exh. 205.

Finally, Mikkelson did not disclose the sale of the Bobcat loader as a transfer of property in response to interrogatories Lureen served approximately two weeks prior to the filing of the involuntary bankruptcy petition.  See Exh. 205, ¶ 11.  Lureen knew of the sale by the time of Mikkelson's deposition on May 16, 2013, however.

## III.    CONCLUSIONS OF LAW

### A.    Jurisdiction

The Court finds that it has jurisdiction under 28 U.S.C. §§ 1334 and 157 and that it has authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

### B.    Mikkelson Is Not Generally Paying His Debts As They Become Due

Section 303 of the Bankruptcy Code governs commencement of involuntary cases.  In a case like this one where there is only one petitioning creditor and the putative debtor contests the petition, bankruptcy relief will not be granted unless there are fewer than 12 creditors who hold a claim against the debtor, the petitioning creditor holds an undisputed claim (or aggregate claims) of at least $14,425 and the debtor is generally not paying his debts as they become due.  11 U.S.C. § 303(b)(2), (h)(1).[11]

---

[11] Section 303(h) provides an alternate ground for relief in an involuntary case. A contested involuntary petition may be granted if

12

Mikkelson conceded that there are fewer than 12 creditors who hold a claim against him and that the undisputed debt he owes to Lureen exceeds $14,425.  The Court received the $5,288,093.44 judgment entered against Mikkelson and in favor of Lureen as evidence.  See Exh. 201.  This debt is not the subject of a bona fide dispute as to liability or amount.  The evidence also confirms that Mikkelson has fewer than 12 creditors.  Accordingly, the primary issue at trial was whether Mikkelson was generally paying his debts as they became due under 11 U.S.C. § 303(h)(1).

Section 303(h)(1) provides, in pertinent part:

> (h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed.  Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if–

> > (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to the liability or amount[.]

11 U.S.C. § 303(h)(1).  The petitioning creditor bears the burden of proving that the putative debtor is generally not paying debts as they become due.  See Murrin v. Hanson (In re Murrin), 477 B.R. 99, 105 (D. Minn. 2012).

---

within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

11 U.S.C. § 303(h)(2).  Neither Lureen nor Mikkelson suggested that a custodian of Mikkelson's property was appointed before the involuntary petition was filed and the Court received no such evidence.  Consequently, section 303(h)(2) is not applicable to the Court's analysis.

The Bankruptcy Code does not define "generally not paying such debtor's debts as such debts become due" and courts have been reluctant to adopt a mechanical test or standard to determine whether this requirement has been met.  In re Murrin, 477 B.R. at 106; In re Ex-L Tube, Inc., 2007 WL 541670, at *4 (Bankr. W.D. Mo. Feb. 16, 2007).  Courts in this circuit, and other circuits as well, consistently apply several factors that are viewed in light of the putative debtor's total financial position.  See Cohen v. Feinberg (In re Feinberg), 238 B.R. 781, 783 (B.A.P. 8th Cir. 1999);[12] In re Murrin, 477 B.R. at 107; In re Ex-L Tube, Inc., 2007 WL 541670, at *4; see also Gen. Trading Inc. v. Yale Materials Handling Corp., 119 F.3d 1485, 1504 n.41 (11th Cir. 1997); Norris v. Johnson (In re Norris), 1997 WL 256808, at *6 (5th Cir. Apr. 11, 1997); Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer), 202 B.R. 341, 350 (E.D.N.Y. 1996) (citing bankruptcy court cases from various circuits).  These factors include:

> (1) the number of unpaid claims;
>
> (2) the amount of the claims;
>
> (3) the materiality of nonpayment; and
>
> (4) the overall conduct of the debtor's financial affairs.

In re Feinberg, 238 B.R. at 783 (citations omitted).

In analyzing the first two factors, bankruptcy courts consider "the proportion of the debt being paid--both in terms of the proportion of creditors being paid and the proportion of debt, in dollar value, being paid."  Concrete Pumping Serv., Inc. v. King

---

[12] Based on a joint motion of the parties, the Eighth Circuit Court of Appeals vacated the Bankruptcy Appellate Panel's judgment and opinion in In re Feinberg and remanded the case with instructions that the panel dismiss the appeal.  See Eighth Circuit Court of Appeals Doc. No. 99-3690, ECF Doc. No. 8.

Constr. Co. (In re Concrete Pumping Serv., Inc.), 943 F.2d 627, 630 (6th Cir. 1991).
See also In re Murrin, 477 B.R. at 107-08.  The fact that a debtor is delinquent on only
one debt will not preclude a determination that the debtor is not paying debts as they
become due.  "There is substantial authority for the proposition that even though an
alleged debtor may owe only one debt, or very few debts, an order for relief may be
granted where such debt or debts are sufficiently substantial to establish the generality
of the alleged debtor's default."  In re Fischer, 202 B.R. at 350-51.   In In re Fischer, the
evidence showed that the debtor owed only two outstanding debts, but the debtor was
in default on both of them and combined the debts exceeded $2.1 million.  Id. at 351.
Because these debts were well in excess of 50% of his current liabilities, the court
found that a reasonable trier of fact could conclude that debtor was not paying his debts
as they became due.  Id.  The In re Fischer court is not alone in its conclusion that the
failure to pay a single creditor or a few debts can satisfy the requirement of generally
not paying debts as they become due where the debt is sufficiently substantial.  See
e.g., In re Concrete Pumping Serv., Inc., 943 F.2d at 630 (finding that debtor was not
"generally" paying debts as they became due because it was in default on 100% of its
debt to only one creditor and noting: "It is impossible to get any more general than
that.").[13]

_____

[13] See also In re Norris, 1997 WL 256808, at *7-8 (finding it significant, in ruling
that the debtor was generally not paying his debts, that the putative debtor was paying
all of his debts except those owed to the three petitioning creditors to whom he made
no payments–even though this debt comprised 62% of his overall debt–and that the
majority of other debt (31%) was to family members); In re Antar, 2013 WL 1622217
(Bankr. S.D. Fla. Apr. 15, 2013) (finding that "under the totality of the circumstances,
Alleged Debtor's non-payment of 85% of his debts as they became due gives rise to the
assertion that he is 'generally not paying his debts as they come due.'"); In re Smith,

15

Assessment of the first two factors in this case shows that Mikkelson routinely pays all his creditors except Lureen, but his $5,288,093.44 debt to Lureen comprises 99.8% of his total liabilities.  In addition to his debt to Lureen, Mikkelson testified that he owes the following debts: $1,900 for a Small Business Administration loan; a $1,200 hospital bill and a $1,200 ambulance bill; two JPMorgan Chase credit card bills, one with an unknown balance and one with a balance of $200 or $300; and a loan on a 2001 pickup truck, which is approximately $3,000.  See Exh. 205.  Except the debt owed to Lureen and a $200 or $300 debt to JPMorgan Chase (which Mikkelson claims was delinquent only because the credit card company refused to accept a payment from him after the involuntary petition was filed), Mikkelson maintains that all his debts are paid when due.  Mikkelson has not made a voluntary payment toward his debt to Lureen.  Whether due to inability or unwillingness to pay, 99% of Mikkelson's debt is owed to Lureen and he is delinquent on the payment of this debt.  Lureen has, therefore, satisfied the first two factors of the section 303(h)(1) analysis.

---

415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (citations omitted) ("Thus, the alleged debtor may not be 'generally' paying his debts as they come due when he is not paying one hundred percent of his debts to only one creditor, or paying most of his debts in number to small recurring creditors, but is not paying a few creditors that make up the bulk of his debts."); In re Euro-Am. Lodging Corp., 357 B.R. 700, 713-14 (Bankr. S.D.N.Y. 2007) (finding that debtor was not paying its debts as they become due where one unpaid claim represented 90% of the total debt and the debt had been in default for 15 years); In re Amanat, 321 B.R. 30, 39-40 (Bankr. S.D.N.Y. 2005) (citations omitted) ("Where a debtor fails to pay even one debt that makes up a substantial portion of its overall liability, a court may find that he is generally not paying his debts."); In re Century/ML Cable Venture, 294 B.R. 9, 31 n.37 (Bankr. S.D.N.Y. 2003) (citations omitted) ("The failure to pay a single debt can satisfy the requirement of generality where the debt is sufficiently substantial."); In re Garland Coal & Mining Co., 67 B.R. 514, 521 (Bankr. W.D. Ark. 1986) (holding that a debtor is generally not paying debts as they become due where it was paying most of its creditors in number but the total debt which it was not paying exceeded 50% of its outstanding liabilities).

16

In assessing the materiality of nonpayment and reviewing Mikkelson's total financial picture, it is apparent that Mikkelson has the resources to pay routine living expenses such as food, clothing and transportation as well as his other debts, except his debt to Lureen.  In early 2013, Mikkelson held assets valued at approximately $400,000.  Excluding his debt to Lureen, attorney's fees and his routine living expenses, his liabilities total $7,600.  Based upon evidence received at trial, this Court easily concludes:  (1) he cannot pay Lureen in full and (2) he has sufficient resources to pay part of his debt to Lureen.

Mikkelson argues he is not violating North Dakota law by refusing to pay Lureen or by paying other creditors instead of Lureen.  While this may be true outside the bankruptcy context, refusing to pay Lureen while also failing to disclose assets in response to post-judgment discovery, transferring assets for little or no consideration and dissipating assets in affirmative efforts to avoid paying his debt to Lureen are all facts this Court may consider in analyzing the materiality of nonpayment and Mikkelson's management of his financial affairs.

Lureen offered evidence that Mikkelson transferred property to his sons after the collision and during a time when he suspected Lureen would pursue a monetary claim against him.  In March 2011, Mikkelson transferred a remainder interest in real property to his sons.  Several months after the real property transfer, Mikkelson sold a skid steer loader to his son (Travis Mikkelson) for substantially less than trade-in value.[14]  During

---

[14] Mikkelson sold the loader to Travis Mikkelson for $5,000 on May 9, 2011.  In December 2012, Travis Mikkelson traded the used loader for a newer model.  Based on an invoice that was difficult to decipher, Mikkelson estimated that the value attributed to the older loader was $11,000.

17

the same month Mikkelson was released from incarceration, Travis Mikkelson traded this skid steer for a newer model. Although the sale documentation lists Travis Mikkelson as the owner of the new loader and Travis Mikkelson reportedly makes payments toward the purchase of the loader, the loader is stored at the Wahpeton Property where Mikkelson lives and it has been used solely to maintain Mikkelson's property. These circumstances may lead a fact finder to infer that Travis Mikkelson is a straw owner of the loader possessed and used by Mikkelson.

Since his release from incarceration, Mikkelson has been drawing down several of his investment accounts, reportedly to pay bills. He withdrew $27,536.63 from an E-Trade IRA account, liquidated a Midland National Life Insurance Company annuity account with a balance of over $9,533.94 and took a $10,000 loan on a Thrivent life insurance policy. Mikkelson, or his brother, Dwight, also withdrew $14,800 from Mikkelson's account at Gate City Bank during the first five months of 2013. It appears that $9,000 of this sum was paid to the Internal Revenue Service. Other than the check to the Internal Revenue Service, payments to his attorney and Farmers Union and generalized comments about paying bills[15] and gambling, Mikkelson could not account for all the funds he withdrew.[16]

---

[15] Mikkelson testified that his typical practice was to pay his bills with a credit card rather than a check or cash withdrawals, which does not appear consistent with his claim that he used the large withdrawals from his E-trade IRA and Midland annuity and a loan from his Thrivent life insurance policy to pay bills.

[16] Bank records from First Community Credit Union suggest that Mikkelson may have made a $3,000 loan payment to or on behalf of his son, Travis Mikkelson, in April 2013. Exh. 209.

Mikkelson's inability or unwillingness to specifically account for the large sums of money he withdrew from his bank accounts shortly after he was released from prison together with his testimony that his objective in making advance payments for fuel and propane was to "spend money," suggest that he may have been dissipating assets to avoid Lureen's debt collection efforts.

Mikkelson's lack of cooperation with Lureen in discovery also raises concerns about his efforts to avoid paying his debts to Lureen. Mikkelson failed to disclose the E-trade IRA, Midland annuity, the funds he transferred from the accounts and his Thrivent life insurance loan in response to post-judgment interrogatories which requested this information. Mikkelson also failed to disclose advance payments for propane and legal services as assets in post-judgment discovery.

After reviewing all the evidence, the Court finds that Mikkelson refused to pay his debt to Lureen and is in default. He has managed his financial affairs with an apparent goal of avoiding Lureen's collection efforts. Mikkelson now seeks to avoid bankruptcy by showing that he pays all other creditors and debts as they come due and arguing that this is a single-creditor involuntary petition filed to further a two-party collection action. Under the circumstances of this case, his reliance on case law cautioning against single-creditor involuntary petitions is not persuasive. See In re Moss, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (finding that putative debtor was not paying her debts as they became due because her unpaid claims totaled 99% of her total debts, she only paid those claims she wanted to pay and she attempted to delay creditors through transfers of assets); In re Food Gallery at Valleybrook, 222 B.R. 480, 488 (Bankr. W.D. Penn. 1998) (noting in support of its ruling that a single creditor can support a finding

19

that debtor is not generally paying its debts as they become due under section 303 that it "will not condone the efforts of a debtor who seeks to take advantage of the general prohibition on involuntary petitions in single-creditor cases by ensuring payment to all, or most, of its smaller periodic debt to the exclusion of larger long-term debt."). Mikkelson's conduct together with his default in the payment of the judgment that comprises 99% of his debt establishes cause for ordering bankruptcy relief.

Citing In re Nordbrock, Mikkelson argues that in absence of fraud or special need for bankruptcy relief, the failure to pay a single debt does not establish that a debtor is not generally paying his debts as they become due.  Br. in Supp. of Answer to Involuntary Case Pet., ECF Doc. No. 11, p. 7 (citing Bankers Trust Co. BT Serv. Co. v. Nordbrock (In re Nordbrock), 772 F.2d 397, 400 (8th Cir. 1985)).  Mikkelson also argues that In re Nordbrock stands for the proposition that "if a creditor is able to collect a debt from state court they have no special need for bankruptcy relief."  Id. at pp. 4-5 (citing In re Nordbrock, 772 F.2d at 400).

In In re Nordbrock, the Eighth Circuit Court of Appeals was troubled by the fact that the petitioning creditor filed an involuntary bankruptcy petition against a putative debtor who maintained that the creditors' claims were both contingent and disputed.  In re Nordbrock, 772 F.2d at 399-400.  It was the disputed nature of the claim together with the fact that the single creditor used the bankruptcy process to litigate and collect this debt that served as the basis for the In re Nordbrock court's decision.  Id.  The In re Nordbrock court did not rule that a single creditor holding an undisputed claim could not initiate an involuntary bankruptcy proceeding or satisfy the "generally not paying such debtor's debts as such debts become due" standard under section 303(h)(1).  As

several courts have observed, precluding a single creditor holding an undisputed claim

from initiating an involuntary bankruptcy petition appears to be in direct contravention to

the unambiguous language in section 303(b)(2), which allows a single creditor holding

an undisputed claim to initiate an involuntary bankruptcy proceeding if the creditor

meets the other criteria in the statute.  See e.g., In re Concrete Pumping Serv., Inc.,

943 F.2d at 630; In re Ex-L Tube, Inc., 2007 WL 541670, at *3; In re Fischer, 202 B.R.

at 346-48; see also In re Feinberg, 238 B.R. at 784 (citing many cases in which courts

permitted a single creditor involuntary petition to proceed).

  This case is distinguishable from In re Nordbrock in at least one material way:

the debt owed to the petitioning creditor is neither contingent nor disputed.  Therefore,

applying the four factors listed above in light of Mikkelson's overall financial position is

appropriate in this case.

  Even if In re Nordbrock is interpreted to require a single petitioning creditor with

an undisputed claim to show fraud or a special need for bankruptcy relief before an

order for relief will be granted under section 303, Lureen has met her burden of proof.

Mikkelson is delinquent on his debt to Lureen which exceeds $5,000,000. He refuses to

make any payments on this debt while paying his other creditors and general

obligations as they become due.  The record shows that he transferred assets to his

sons, including a remainder interest in his home.  In the months between his release

from incarceration and the initiation of the involuntary petition, Mikkelson has been

withdrawing large sums of money, while offering no accounting for how much of this

money was spent.  He has not been fully cooperative with post-judgment discovery

served by Lureen.

21

In addition, Lureen argues that bankruptcy offers remedies unavailable to her in state court.  Both parties concede that Mikkelson's debt to Lureen is not disputed. Lureen's tort action was tried and judgment was entered in state court.  In his Brief in Support of Answer to Involuntary Case Petition, Mikkelson explained that Lureen's tort lawyer began the process of collecting the judgment, but he became frustrated because all of Mikkelson's property is exempt "either in the form of homestead, federally protected by ERISA pension plans or other retirement plans exempt under N.D.C.C. Ch. 28-22-03.1(7)."  Br. in Supp. of Answer to Involuntary Case Pet., ECF Doc. No. 11, p. 1.  Mikkelson asserts that his current income from social security and military retirement benefits is likewise exempt.  Id.

Lureen acknowledges that there are exemption barriers to her collection efforts under North Dakota law and argues that bankruptcy law may grant her relief not otherwise permitted under North Dakota law.  Specifically, she contends that the Wahpeton Property would be subject to liquidation in bankruptcy but not under North Dakota law governing fraudulent transfers.  She also claims that some of Mikkelson's financial accounts could be liquidated in bankruptcy, even though they would not be subject to levy and execution under North Dakota law.  Therefore, she argues that she has a special need for bankruptcy relief.

Under the North Dakota Uniform Fraudulent Transfer Act, the transfer of an "asset" excludes "property to the extent it is generally exempt under nonbankruptcy law."  N.D.C.C. § 13-02.1-01(2).  To the extent that the Wahpeton Property is Mikkelson's homestead and exempt under North Dakota law, Lureen would not have a remedy for the alleged fraudulent transfer of the Wahpeton Property under the North

22

Dakota Uniform Fraudulent Transfer Act.  There were not sufficient facts received into evidence at trial to determine whether a fraudulent transfer of Wahpeton Property occurred and whether liquidation under bankruptcy law would be permitted.  It is also not clear whether Mikkelson's financial accounts would be subject to liquidation under bankruptcy law.  The only conclusion this Court may draw is that bankruptcy relief may afford Mikkelson's creditors more opportunity to liquidate the Wahpeton Property than North Dakota law.  This slight advantage together with all the analysis of the other factors listed above justifies an exception to the single-creditor rule, to the extent it applies in this case.

### C.    Abstention Is Not Appropriate In this Case

In Debtor's Response to Kathleen A. Lureen's Pre-Trial Statement dated May 30, 2013, Mikkelson, argued that abstention is appropriate and requested the Court to dismiss the involuntary petition pursuant to 11 U.S.C. § 305(a)(1).  Section 305(a)(1) of the Bankruptcy Code allows the Court to dismiss an involuntary bankruptcy case if "the interests of creditors and the debtor would be better served by such dismissal[.]" 11 U.S.C. § 305(a)(1).  "Abstention is an extraordinary power that should be used only in extraordinary circumstances."  Pennino v. Evergreen Presbyterian Ministries (In re Pennino), 299 B.R. 536, 538 (B.A.P. 8th Cir. 2003) (citation omitted).  The factors relevant to the abstention inquiry, include:

(1) whether the case is a two-party dispute,

(2) the economy and efficiency of administration;

23

(3) the availability of another case or forum to protect the interests of the
parties;

(4) alternative means of achieving equitable distribution of assets, and

(5) the purpose for which bankruptcy jurisdiction has been sought.

Id. at 539.  Other factors considered by courts analyzing a request for abstention
include:  whether there is already a pending proceeding in state court; whether federal
proceedings are necessary to reach a just and equitable solution; whether the debtor
and the creditors are able to work out a less expensive out-of-court arrangement which
better serves all interests in the case; the nature of assets available for liquidation and
disbursement to creditors; and the motivations of the petitioning creditors, including
whether the creditor filed the involuntary petition to gain negotiating or other leverage in
state court lawsuits.  In re Selectron Mgmt. Corp., 2010 WL 3811863, at *5 (Bankr.
E.D.N.Y. 2010) (citations omitted); In re Jr. Food Mart of Arkansas, Inc., 241 B.R. 423,
426-27 (Bankr. E.D. Ark. 1999).  The moving party bears the burden of demonstrating
that the interests of both the debtor and his creditors would benefit from dismissal.  In re
Selectron Mgmt. Corp., 2010 WL 3811863, at *5.

        This Court is not persuaded that abstention is appropriate in this case.  As
Mikkelson concedes, the state tort action is complete and there do not appear to be any
state law collection remedies available to Lureen because Mikkelson's property is
exempt under state law.  Br. in Supp. of Answer to Involuntary Case Pet., ECF Doc. No.
11, p. 1.  Consequently, there is no other forum to protect the interests of Mikkelson's
most significant creditor, Lureen.  Likewise, there are no alternative means of achieving

24

a just and equitable distribution of assets.  Without bankruptcy relief, Mikkelson may continue to pay all but one of his creditors, while ignoring the one debt that constitutes 99% of his liabilities.  Among other objectives, the bankruptcy system is designed to afford equitable treatment to all creditors.  Lureen's involuntary petition serves this purpose.

Finally, the Court sees no purpose in dismissing the involuntary petition to allow the parties to pursue out-of-court arrangements.  Evidence from both parties indicates that attempts to resolve the debt to Lureen have been unproductive.  There was no evidence of continuing negotiations at the time of trial.

Although the bankruptcy process will consume time and resources, the Court finds that the totality of circumstances including Mikkelson's management of his financial affairs, the possibility that Lureen and Mikkelson's other creditors may recover assets otherwise unavailable under state law and the just and equitable treatment of all creditors in bankruptcy justifies granting Lureen the relief she seeks.  The interests of all the creditors would not be better served by abstention.  An order of bankruptcy relief shall be entered.

The Court has considered all other arguments and deems them without merit.

25

IV.    **CONCLUSION**

Upon consideration of the involuntary petition filed March 29, 2013, and for the

reasons stated above, **IT IS ORDERED**:

1.    an order for bankruptcy relief under Chapter 7 of Title 11 of the United

States Code is **GRANTED**.

2.    within seven days after this order is entered, Debtor shall file a list in

matrix form containing the name and address of each creditor to be

included in the schedules as required by Federal Rule of Bankruptcy

Procedure 1007(a)(2).

3.    within fourteen days after this order is entered, Debtor shall file the

schedules, statements and other documents required by Federal Rule of

Bankruptcy Procedure 1007(b)(1).

Dated: September 11, 2013.

Shon Hastings, Judge
United States Bankruptcy Court

26